678 A.2d 116

**WOODFIN EQUITIES CORP., et al.**

v.

**HARFORD MUTUAL INSURANCE COMPANY.**

No. 1418, Sept. Term, 1995.

Court of Special Appeals of Maryland.

June 27, 1996.

618

Susan M. Kayser (Robert D. Sokolove and Sokolove & Associates, on the brief), Bethesda, for Appellants.

Albert J. Mezzanotte, Jr. (Edward M. Buxbaum and Whiteford, Taylor & Preston, on the brief), Towson, for Appellee.

Before WILNER, C.J., and WENNER and DAVIS, JJ.

DAVIS, Judge.

This is an appeal from an August 28, 1995 order of the Circuit Court for Montgomery County granting an insurer's motion for judgment in a declaratory relief action filed by an injured third party. The principle questions presented on this appeal are restated as follows:

I. Should this Court deny the insurer's motion to dismiss this appeal?

II. Do the injured third parties have standing to file a declaratory judgment action directly against the insurer?

III. Did the circuit court correctly determine that the insurer was not obligated to provide liability coverage under the terms of the CGL policy?

IV. Did the circuit court correctly determine that the insurer was not prejudiced by the insured's failure to notify the insurer of the claim of the injured third parties?

To the first, second, and fourth questions, we respond in the affirmative. To the third question, we respond partially in the affirmative and partially in the negative. As a result of the disposition of these questions, we affirm in part and reverse in part the judgment of the circuit court.[1] Accordingly, the case shall be remanded to the circuit court for further proceedings.

## FACTS

This appeal involves a declaratory judgment action filed by injured third parties against an insurer for the purpose of determining the extent of the insurer's obligations under a CGL policy. Before we present the factual backdrop, we shall introduce the key players involved to aid in comprehending the interrelation of the parties in this case. Beginning with the principal actors, Woodfin Equities Corporation (Woodfin), Samuel A. Hardage (Hardage), and Hardage Construction Company (HCC) are the injured parties and appellants. Appellants constructed a hotel in Rockville, Maryland, known as the Woodfin Suites Hotel (hotel). HCC was the general contractor for the project. Harford Mutual Insurance Company is the insurer and appellee. Appellee issued a comprehensive general liability (CGL) policy to its insured, Deerfield Engineering, Incorporated, (Deerfield Engineering or insured)—a mechanical subcontractor hired by appellants to provide all labor and materials and to do all things necessary for the installation and completion of the hotel's heating, ventilation, and air conditioning (HVAC) system. The insured's owner is Donald Paulgaard. At different points in

---

1. This Court originally filed its opinion in this appeal on May 8, 1996. On May 23, 1996, however, appellee filed a motion for reconsideration with this Court. Upon examination of the issues and arguments raised in appellee's motion, we determined that our May 8, 1996 opinion should be revised in certain respects. This opinion reflects those revisions.

time, the insured had offices in Austin and Marble Falls, Texas, and in Rockville, Maryland.

Along with the insured, the Trane Company and Climatemaster were involved in the construction of the hotel. According to appellants, Trane was the manufacturer of the HVAC systems that the insured installed, and Climatemaster participated in the manufacturing of the HVAC units and component parts. The remaining entity is Deerfield, Incorporated—not to be confused with the insured. The role of Deerfield, Incorporated is pivotal, although its involvement is peripheral. Deerfield, Incorporated, is an electrical contracting company located in Kingsville, Maryland. According to Martin W. Lotz, Jr., its President and CEO, Deerfield, Incorporated, is not and never has been insured by appellee. Furthermore, according to Lotz, Deerfield, Incorporated, was not involved in any way with the construction of the hotel.

In January 1990, appellants, by a six-count complaint, sued Trane, Climatemaster, and Deerfield, Incorporated, in the Circuit Court for Montgomery County, for breach of contract, negligence, breach of express warranty, breach of implied warranty, breach of implied warranty of fitness for particular purpose, and strict liability. (The Trane litigation or Trane suit.) In the caption of the Trane complaint, Deerfield, Incorporated, is designated as an Austin, Texas corporation, and Martin W. Lotz, Jr. is designated as the person to be served with the complaint at his Kingsville address.

According to the Trane complaint, the hotel opened its doors to the public on February 23, 1988. Appellants alleged that, in March, 1988, the hotel began to experience problems with the HVAC system, and that, by June 1989, 130 HVAC units failed at least once, and continue to fail. Appellants claimed that Trane, Climatemaster, and Deerfield, Incorporated, were responsible for the failures in the HVAC system. In particular, appellants asserted that Deerfield, Incorporated, failed to install, service, and inspect properly the HVAC systems in the hotel. For example, according to appellants, Deerfield, Incorporated, failed to install a "suction screen

diffuser" and improperly positioned the "thermostat sensor bulb" on the units. The complaint asserts that, as a result of the conduct of Trane, Climatemaster, and Deerfield, Incorporated, appellants incurred considerable losses and expenses, including the loss of income from the unavailability of guest rooms, costs associated with the repair and replacement of pumps in the HVAC system, consultant fees for conducting tests and providing opinions as to the reasons for the HVAC failures, management time expended with respect to customer relations and correcting the problems in the HVAC system, increased energy costs, loss of goodwill, and attorney's fees and costs related to the Trane litigation.

Appellants served Lotz with a summons and complaint for the Trane litigation. According to Lotz, since Deerfield, Incorporated, had nothing to do with the construction of the hotel, Lotz contacted appellants' attorneys to advise that they had sued and served the wrong company. Nonetheless, Lotz continued to receive various pleadings and related legal documents for some period of time. Eventually, these papers stopped arriving at Lotz's address, as a result of which Lotz was led to believe that appellants' counsel had corrected their mistake. In addition to service upon Lotz, the record indicates that appellants apparently realized their error and had Paulgaard served. A September 24, 1991 Affidavit of Service of Process (on appellants' counsel's letterhead) states that Paulgaard was served with the Trane litigation papers on March 23, 1991. In depositions, however, Paulgaard claimed that he did not learn of the Trane suit until 1994. At trial, appellants strenuously objected to the September 24, 1991 Affidavit of Service of Process, and took the position that Paulgaard did not know about the Trane suit until 1994. As shall become more clear below, it benefited appellants in a significant way if Paulgaard did not actually learn of the Trane suit until 1994, because appellee did not learn of the suit until June 1994 (from appellants' counsel), and claimed—as a basis for denial of coverage—that Paulgaard breached his duty to notify appellee of the suit since Paulgaard knew about the suit

in 1991 but never informed appellee of it at that time or at any time.

In any event, neither the insured, nor Deerfield, Incorporated (as would be expected), answered the Trane complaint. On March 9, 1992, over two years after the Trane suit was filed, the Clerk of the circuit court issued a Notice of Default Order to "Deerfield Incorporated," stating "that an Order of Default has been entered against you in the above entitled case on 3/2/92." On May 8, 1992, the circuit court conducted an ex parte hearing for the purpose of determining damages against Deerfield, Incorporated. At the conclusion of that hearing, the circuit court entered a default judgment against "Deerfield, Incorporated" for $168,102.84.

Two years later, in May 1994, appellants allegedly "discovered" a Certificate of Insurance (certificate), indicating that appellee had previously issued a CGL policy to the insured. The insured is identified on the certificate as follows:

Deerfield Engineering

Donald Marvin Paulgaard

15 Dairyfield Court

Rockville, Md 20852

HCC is designated as the certificate holder. In addition, the certificate explicitly states:

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

Following the "discovery" of the certificate, appellants' counsel wrote a letter to appellee dated June 14, 1994, wherein appellants informed appellee of the discovery of the certificate and its claim against the insured. By that letter, appellants invited appellee to engage in settlement discussions and offered to open its files to appellee. Furthermore, the letter stated that, if appellee declined to settle the matter, appellants would vacate the default judgment for the purpose of attempt-

ing to assess a new damages amount in light of the fact that appellants allegedly have continued to suffer losses from the HVAC failures—a course of action that would purportedly "expose [appellee] to potential damages of Two Million Dollars." In response, appellee informed appellants' counsel, by letter dated June 30, 1994, that "there will be no coverage available to Deerfield Engineering for this occurrence. There are a number of coverage issues which contributed to this decision."

Subsequent to that exchange, appellants filed the instant declaratory judgment action in the Circuit Court for Montgomery County directly against appellee. The declaratory judgment action was filed on January 13, 1995—over two and one-half years after the date of the default judgment against "Deerfield, Incorporated," over five years after the filing of the Trane suit, and over six and one-half years after the insured's alleged failures. Appellants did not name, or attempt to join, the insured as a party to this declaratory judgment action. Indeed, the insured is noticeably absent as a party to these proceedings.

In their complaint for declaratory judgment, appellants recited the foregoing facts and set forth the stated damages. Of particular interest is that appellants identify the insured as "Deerfield, Incorporated," and state that they have obtained a default judgment against Deerfield, Incorporated. Finally, the complaint requests the circuit court to grant, *inter alia,* the following relief: (1) "Declare that coverage be established under" appellee's CGL policy; (2) "Declare that coverage be afforded to Deerfield under" appellee's CGL policy "for the damages arising from Deerfield's installation of the HVAC systems"; (3) "Declare [appellee's] duty to defend"; and (4) "Declare that [appellants] may seek a direct action against [appellee] for the amount of the Default Judgment and for all other damages resulting from its insured's wrongdoing."

In response to appellants' complaint, appellee filed an answer on January 31, 1995, setting forth a number of defenses. One such defense was that the terms of the CGL policy did

not obligate appellee to provide insurance coverage in this case. In addition, appellee defended on the ground that appellants allegedly lacked standing because they are not "insureds" under the CGL policy. Notably, appellee denied that it issued an insurance policy to "Deerfield, Incorporated." Furthermore, appellee defended against the complaint on the ground that the insured failed to notify appellee of the claim pursuant to the terms of the CGL policy, and that this failure caused substantial prejudice to appellee.

Meanwhile, during a February 21, 1995 hearing in the Trane litigation before Judge Mason, the circuit court dismissed Woodfin's and HCC's actions against the remaining parties, Trane and Climatemaster, because of the forfeiture of Woodfin's corporate charter. During that hearing, the circuit court ruled that it was unable to determine "at this time" whether Hardage's action should also be dismissed by virtue of the forfeiture of the corporate charter. Accordingly, the circuit court scheduled a motions hearing for April 27, 1995 to consider further argument on the matter. Unfortunately, there is no evidence in the record indicating the disposition of Hardage's claims. The record, however, contains representations by the parties that all of the claims of the plaintiffs in the Trane litigation were dismissed. The important thing, for purposes of this appeal, is not when final judgment disposing of all claims against all parties was actually entered in the Trane litigation, but that final judgment was entered in the Trane litigation no earlier than February 21, 1995. For the sake of convenience, we shall proceed as if final judgment was entered on that date.

In the instant declaratory judgment action, following its answer, appellee filed a motion for summary judgment in April 1995. Therein, appellee argued that it was entitled to judgment on three grounds. First, appellee argued that, because Deerfield, Incorporated is not appellee's insured, appellee owes no obligation to appellants with respect to the judgment that appellants obtained against that entity. Second, appellee argued that it was entitled to judgment "due to the complete lack of notice given to it until nearly two years

after the entry of a Default Judgment," and that this delay in notice constituted actual prejudice under Maryland case law. Finally, appellee asserted that the CGL policy does not protect against the acts alleged in the Trane complaint. In this latter regard, appellee argued that appellee is not obligated to provide coverage because: (1) the claim does not involve "property damage" arising out of an "occurrence," as those terms are defined in the CGL policy, and (2) certain coverage exclusions existed. On June 1, 1995, appellee's motion for summary judgment was denied.

The matter proceeded to trial on June 28, 1995. At trial, two witnesses testified for appellants, and eleven exhibits were introduced into evidence (six by appellants and five by appellee). Appellants' first witness was Peter Kruse, a representative from the Hardage Group—the entity that owns HCC and Woodfin. Kruse explained that the insured was employed to install the HVAC and plumbing system for the hotel. Kruse testified that the HVAC units began to fail. Kruse responded in the affirmative when asked whether the HVAC failures arose as a result of the insured's faulty installation of the units. According to Kruse, the failures resulted from "a number of acts that were performed [by the insured], including" rupturing or fracturing capillary tubes in the units during installation and placing the temperature-sensing bulb in the wrong position. Kruse stated that as the units failed they had to be replaced throughout the hotel. According to Kruse, replacement caused damage to the walls and carpeting of the hotel. Kruse stated that damages also included loss of room occupancies, replacement of the HVAC units, consultants' fees, management time, and loss of goodwill.

Appellants also called Robert F. Ohler, Jr. to testify. Ohler is appellee's claims manager. Ohler acknowledged that appellee undertook no investigation into the facts of the loss beyond reviewing appellants' Trane complaint. Indeed, Ohler agreed that, apart from what was alleged in that complaint, he had no knowledge about the manner in which the HVAC system was installed, nor the manner in which the HVAC goods were handled. In this regard, Ohler stated, based on his review of

that complaint, "I have determined that there wasn't coverage for any of the damages sought or the claims sought by [appellants]." Ohler acknowledged that appellants offered to vacate the default judgment, but maintained that that would not have cured the prejudice that appellee suffered from the late notice of the claim. Ohler admitted that appellee equated the passage of time with prejudice. Significantly, Ohler further stated that appellee had the opportunity to interview Paulgaard regarding the claim, but chose not to do so. In addition, Ohler testified that, even if the alleged damages could be considered property damage under the CGL policy, various coverage exclusions in the CGL policy existed, under which appellee could properly deny coverage.

At the conclusion of appellants' case, on June 28, 1995, appellee moved for judgment pursuant to MARYLAND RULE 2–519, essentially reiterating those arguments asserted on its motion for summary judgment.[2] From the bench, the circuit court ruled that appellee was not prejudiced, believing that appellee had proper notice of the claim. The circuit court, however, granted appellee's motion for judgment on the ground that appellee was not obligated to provide coverage under the terms of the CGL policy. In this regard, the circuit court stated that its ruling was based on its "careful perusal" of the CGL policy and appellants' Trane complaint. In granting judgment, the circuit court did not address appellant's standing argument.

The June 30, 1995 docket entry reflecting the circuit court's grant of judgment from the bench, reads:

---

**2.** Appellee slightly modified its argument that it was not obligated to provide coverage with respect to a judgment obtained against "Deerfield, Incorporated." Appellee argued that, apart from the fact that the judgment is not against its insured, appellants may not proceed against appellee because they have not complied with MD.ANN.CODE art. 48A, § 481, since they have not executed upon the judgment, and the judgment has not been returned unsatisfied. As we shall explain, however, Kruse testified that its private investigator searched for assets of Deerfield Engineering, but found nothing.

COURT (BEARD, J.) FINDS IN FAVOR OF DEFE-
DANT [sic] HARFORD MUTUAL INSURANCE COMPA-
NY AGAINST PLAINTIFF WOODFIN EQUITIES COR-
PORATION, SAMUEL A. HARDAGE AND HARDAGE
CONSTRUCTION COMPANY. ORDER TO BE SUB-
MITTED.

Consistent with this docket entry, a written order embodying the circuit court's grant of judgment from the bench was entered on the docket by the clerk on August 28, 1995. That order reads:

UPON CONSIDERATION OF [appellee's] Motion for Judgment pursuant to Maryland Rule 2–519, the arguments of counsel with respect to said Motion on June 28, 1995, and the evidence presented by the [appellants] at trial in this matter on June 28, 1995, and for good cause shown, it is this 24th day of August, 1995, hereby;

ORDERED that [appellee's] Motion is GRANTED.

From this grant of judgment in appellee's favor, appellants appeal to this Court.

## DISCUSSION

### I

Before addressing the merits of this appeal, we must dispose of appellee's motion to dismiss this appeal. Appellee argues that this appeal must be dismissed because appellants did not timely file their Notice of Appeal pursuant to MARYLAND RULE 8–202(a) (1996), which provides that "the notice of appeal shall be filed within 30 days after entry of the judgment or order from which the appeal is taken." " 'Entry' . . . occurs on the day when the clerk of the lower court first makes a record in writing of the judgment, notice, or order on the file jacket, on a docket within the file, or in a docket book, according to the practice of that court, and records the actual date of the entry." MD.RULE 8–202(f).

In the instant case, appellants' Notice of Appeal was filed on July 26, 1995—less than 30 days after the circuit

court's bench ruling granting appellee's motion for judgment, but before August 28, 1995, the date on which the clerk entered the circuit court's written order on the docket. According to appellee, therefore, appellants' notice of appeal was ineffective because it was prematurely filed before the entry of the circuit court's final order, and, therefore this Court lacks jurisdiction, and the appeal must be dismissed.

We disagree. As appellants correctly point out, they timely noted their appeal to this Court by virtue of MARYLAND RULE 8–602(d), which provides:

> A notice of appeal from a ruling, decision, or order that would be appealable upon its entry on the docket, filed after the announcement of the ruling, decision, or order by the trial court but before entry of the ruling, decision, or order on the docket, shall be treated as filed on the same day as, but after, the entry on the docket.

*See Waller v. Maryland Nat'l Bank*, 332 Md. 375, 380 n. 2, 631 A.2d 447 (1993) ("Had a confirmatory order been filed by the trial court after its oral ruling, and after the appeal had been noted, the appeal could have been saved by the use of Maryland Rule 8–602(d)."). Under a plain reading of Rule 8–602(d), in light of the procedural events following the circuit court's bench ruling, we are required to treat appellants' notice of appeal as timely filed.

## II

Next, we must address appellee's argument that appellants lacked standing to assert a declaratory judgment action directly against appellee. We conclude that appellants had proper standing.

In their reply brief to this Court, appellants intimate, without much explanation, that the issue of standing may not now be raised. As our factual recitation indicates, appellee has raised the issue of standing at every procedural juncture in this case. As a result, appellants' argument cannot be based on an alleged failure to raise this issue in the proceedings below. Furthermore, appellee's failure to file a

cross-appeal on this issue does not preclude us from considering it. As the Court of Appeals recognized:

> Where a party has an issue resolved adversely in the trial court, but ... receives a wholly favorable judgment on another ground, that party may, as an appellee and without taking a cross-appeal, argue as a ground for affirmance the matter that was resolved against it at trial. This is merely an aspect of the principle that an appellate court may affirm a trial court's decision on any ground adequately shown by the record.

*Offutt v. Montgomery County Bd. of Educ.*, 285 Md. 557, 564 n. 4, 404 A.2d 281 (1979) (citations omitted). In any event, "we consider the issue of standing as falling within the category of cases, in addition to jurisdiction, that an appellate court may address although it was not raised by a party." *Commission on Human Relations v. Anne Arundel County*, 106 Md.App. 221, 236, 664 A.2d 400 (1995). Having determined that the issue of standing is properly before this Court, we now explain why appellants had standing to file the instant declaratory judgment action.

■ We agree with appellee that, before an injured party may sue an insurer directly, the injured party must first obtain a judgment against the insured and that judgment must be returned unsatisfied, or the insured must refuse to pay it. In *Butler v. Liberty Mut. Ins. Co.*, 36 Md.App. 684, 685, 375 A.2d 576 (1977), the plaintiff was injured while a passenger in a vehicle insured by the insurance company. The injured passenger sued the driver of the vehicle, but the insurance company denied coverage. *Id.* at 685–86, 375 A.2d 576. While the tort action was pending, the injured passenger filed a declaratory judgment action against the insurance company to resolve the issue of insurance coverage. *Id.* The insured was joined as defendant in the declaratory judgment proceedings. *Id.* at 685, 375 A.2d 576.

We affirmed the circuit court's dismissal of the injured passenger's declaratory judgment action on the ground that the passenger's action could not be legally maintained. *Id.* at

692, 375 A.2d 576. In so doing, we concluded that, "until and unless [the passenger] obtains a judgment against ... the insured and that party refuses to pay the judgment," an actual controversy would not exist under Maryland's version of the Uniform Declaratory Judgments Act. *Id.* (citing MD.CODE ANN., CTS. & JUD.PROC. § 3–409(a) (1974)). *See also* MD.CODE ANN., CTS. & JUD.PROC. § 3–409(a) (1995) ("a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceeding, and if: (1) An actual controversy exists between contending parties; (2) Antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation; or (3) A party asserts a legal relation, status, right, or privilege and this is challenged or denied by an adversary party, who also has or asserts a concrete interest in it.").

In addition to being reaffirmed in *Anne Arundel County v. Ebersberger*, 62 Md.App. 360, 369, 489 A.2d 96 (1985), the rule in *Butler* was implicitly recognized in *Benning v. Allstate Ins. Co.*, 90 Md.App. 592, 595–96, 602 A.2d 233 (1992). In *Benning,* the plaintiff was injured while a passenger in a car driven by her sister, the insured. *Id.* at 594, 602 A.2d 233. Rather than sue her sister, the plaintiff filed a declaratory judgment action against her sister's insurer, seeking to establish that the household exclusion in her sister's policy did not apply. *Id.* The insurer moved for dismissal on the ground that the plaintiff lacked standing to bring the action under *Butler. Id.* In addition, the insured filed a motion to intervene in the case, asserting that she wanted the insurer to compensate the plaintiff, but did not want the plaintiff to sue her. *Id.* at 595, 602 A.2d 233. Both the insurer's motion to dismiss and the insured's motion to intervene came before the trial court. *Id.* The plaintiff conceded that the insurer's motion was well founded and that, had she known of *Butler,* she would not have filed the declaratory judgment action. *Id.* The circuit court then granted the insurer's motion to dismiss, and decided not to address the insured's motion to intervene because the grant of the insurer's motion resulted in no case

existing in which the insured could intervene. *Id.* Both the plaintiff and insured appealed to this Court, where the plaintiff again conceded that *Butler* controlled her case, and did not challenge the soundness of that decision. *Id.* Therefore, we dismissed the plaintiff's appeal. *Id.* at 596, 602 A.2d 233.[3]

Apart from the rule in *Butler*, MD.ANN.CODE art. 48A, § 481 (1994) supports the principle that an injured party may proceed against the insurer only after obtaining a judgment against the insured. This section provides:

No liability insurance policy issued in this State shall contain any requirement for the payment of liability or loss under the policy, by the assured, but all such policies shall provide in substance ... that if an execution upon any final judgment against the assured is returned unsatisfied, in whole or in part, in an action brought by the injured ... then an action may be maintained by the injured ... against the insurer under the terms of the policy for the amount of any judgment recovered in such action, not exceeding the amount of the policy, and every such policy shall be construed to so provide, anything in such policy to the contrary notwithstanding.

*Id.*[4] The Court of Appeals determined that this provision "does not contemplate a direct action against the insurer by a tort claimant in advance of some determination of liability on

---

3. With respect to the insured's appeal, we determined that the circuit court erred in rejecting the insured's motion to intervene, because we concluded that the insured had standing to seek a declaratory judgment as to her coverage under the policy in advance of a judgment in favor of, or a suit filed by, the plaintiff. *Benning*, 90 Md.App. at 596–604, 602 A.2d 233. This aspect of *Benning* has no bearing on the instant dispute because here the insured is not seeking coverage against appellee, nor has the insured sought to intervene in this action.

4. The CGL policy at issue in this case provides that, "No action shall lie against the [appellee] unless, as a condition precedent thereto ... the amount of the insured's obligation to pay shall have been finally determined ... by judgment against the insured after actual trial...." The term "actual trial," as used in insurance policies; has been defined to include default judgments. *Smithers v. Mettert*, 513 N.E.2d 660, 664 (Ind.Ct.App.1987).

the part of the insured in the pending action." *Gorman v. St. Paul Fire & Marine Ins. Co.*, 210 Md. 1, 7, 121 A.2d 812 (1956). *See also In re Harbor Towing Corp.*, 335 F.Supp. 1150, 1155 (D.Md.1971) (In Maryland, under § 481, no direct action may be maintained against the insurer unless the injured party obtains a judgment against the insured and the judgment is returned unsatisfied). *Cf. Bean v. Allstate Ins. Co.*, 285 Md. 572, 577, 403 A.2d 793 (1979) (Under § 481, a judgment creditor has no cause of action against an insurer directly for sums above the policy limits).

██ In light of the foregoing, therefore, appellee is correct that, before an injured party may maintain a direct action against an insurer, the injured party must obtain a judgment against the insured, and that judgment must be returned unsatisfied or the insured must refuse to pay the judgment. We disagree with appellee, however, with the manner in which it applies this principle to the facts of the instant case. With respect to the first part of the principle (i.e., obtaining a judgment against the insured), appellee asserts that appellants have not obtained a judgment against the insured. Rather, according to appellee, the default judgment that appellants obtained is against Deerfield, Incorporated—"a completely unrelated entity." While we concur that Deerfield, Incorporated is not the "named insured" under the CGL policy, we reject appellee's view that the default judgment is not against the insured.

The default judgment, although in the name of Deerfield, Incorporated, is a valid judgment against the insured. Long ago, the Court of Appeals announced:

There is no doubt, that where a party is sued by a wrong name, and he *appears* to the suit and does not plead the misnomer in abatement, and judgment is rendered against him in the erroneous name, execution may be issued upon it in that name, and levied upon the property and effects of the real defendant; but there is some conflict in the decisions, whether the same result will follow if he does not appear, and the judgment is obtained by default. The weight of authority, however, is that this makes no differ-

ence, and if the writ is served on the party intended to be sued, and he fails to appear and plead in abatement, and suffers judgment to be obtained by default, he is concluded, and in all future litigation may be connected with the suit or judgment by proper averments.

*First Nat'l Bank of Baltimore v. Jaggers,* 31 Md. 38, 47 (1869). In *Jaggers,* a garnishee bank resisted a judgment creditor's attempt to attach the assets and credits of its customer, "Wales B. Lounsbury," because the judgment was against "William B. Lounsbury." *Id.* at 46–47. The Court rejected the garnishee bank's position because the creditor, intending to sue "Wales," served "Wales," and, since "Wales" did not appear, obtained a default judgment against him, but in the incorrect name of "William." *Id. See also* 1 A.C. FREEMAN, LAW OF JUDGMENTS § 414, at 901 (5th ed. 1925) (where there is service upon the correct party, but judgment is obtained in an incorrect name, the judgment is nonetheless effective against the correct party).

To be sure, the insured and Deerfield, Incorporated are two distinct entities. In this case, however, after apparently learning from Lotz that Deerfield, Incorporated was not involved in the construction of the hotel, appellants *did* serve Paulgaard with the Trane suit papers—as appellee throughout this litigation has so strenuously argued had occurred. Although the Affidavit of Service of Process (typed on appellants' counsel's letterhead) indicates that Paulgaard was served with the Trane initial pleadings on March 23, 1991, appellants maintained at trial that Paulgaard did not have notice of the Trane suit until 1994. An affidavit of service in proper form is prima facie evidence that a party has been served. *McGinnis v. Rogers,* 262 Md. 710, 737, 279 A.2d 459 (1971). Paulgaard's deposition testimony that he could not recall whether he was served in 1991 is insufficient to rebut the presumption that he had been served. In addition, appellants did not raise, (although they could have), a legitimate objection to the form of the affidavit of service (it was filed some six months after service. *See* MD.RULE 2–126(a)). Therefore, for purposes of this appeal, the return of service is in proper form. Moreover,

despite the fact that appellee is advancing the lack of standing argument, appellee has strenuously maintained throughout this litigation that Paulgaard was served in 1991 with the Trane suit papers, e.g., appellee successfully admitted the affidavit into evidence. Under these circumstances, we may conclude as a matter of law that Paulgaard was served with the Trane pleadings in March of 1991. All parties acknowledge that the insured (Deerfield Engineering) is the correct party and that Deerfield, Incorporated has nothing to do with the alleged insurance loss involved in this case. Moreover, Paulgaard acknowledged that the insured is the subcontractor who worked on the hotel's HVAC system. Therefore, even though the insured and Deerfield, Incorporated are two separate entities, this is not a case of mistaken identity or "misjoinder," but rather is a case involving a mere "misnomer." *See, e.g, McSwain v. Tri–State Transp. Co.,* 301 Md. 363, 483 A.2d 43 (1984) (Because the real defendant had notice of the case all along, and therefore, was not prejudiced by the plaintiff's naming of the incorrect defendant as the real defendant—and despite the fact that the incorrect defendant was an existing and distinct entity having nothing to do with the lawsuit—the erroneous designation was a misnomer, as opposed to a misjoinder).

Since this is a misnomer situation, the insured could not legally avoid the default judgment on the technical ground that the judgment is in the incorrect name. To the contrary, consistent with *Jaggers,* the default judgment is a valid judgment against the insured, i.e., the real defendant in the Trane litigation. *See* 67A C.J.S. *Parties* § 165 (1978) ("When service of process is effected under a misnomer upon a party intended by plaintiff to be sued and the defendant is fairly apprised that it is the party the action was intended to affect, the court has jurisdiction over the defendant."). Accordingly, the default judgment in the name of "Deerfield, Incorporated" is a valid judgment and is effective against the insured.

■ With respect to the second part of the above standing principle (i.e., the judgment against the insured must be

returned unsatisfied or the insured must refuse to pay the judgment), we reject appellee's argument that appellants lacked standing because they allegedly failed to enforce the judgment. In this regard, appellee asserts that Kruse's testimony indicates that "no real efforts were made" to enforce the judgment. We draw a very different conclusion from Kruse's testimony. Kruse explained that appellants hired a private investigator to search for assets of the insured, but that none could be found. Kruse further explained that it could not attempt to attach the insured's assets because appellants could not find any such assets. Moreover, Paulgaard testified in his deposition that the insured's assets were sold in 1988, and that, after closing the company, he left the United States and moved to Canada, where he currently resides. Indeed, Paulgaard was well aware of the default judgment, but evidenced no inclination that he intended to satisfy it on behalf of the insured. In fact, Paulgaard's position was that the insured did not cause appellants' loss. In short, the evidence was overwhelming that the insured was judgment proof. Nonetheless, appellee points out that appellants "did not file any documents with respect to attempting to satisfy the judgment." Under these circumstances, however, the evidence was conclusive that to do so would have been an exercise in futility, as well as a monumental waste of money. This evidence of total insolvency, in our view, is sufficient to satisfy the requirement that the judgment against the insured must be returned unsatisfied, or that the insured must refuse to pay it, before the injured party may directly sue the insurer.

We hold, therefore, that, because appellants obtained a valid judgment against the insured, and in light of the fact that they presented sufficient evidence that the judgment was worthless, the circuit court did not err by failing to grant appellee's motion for judgment with respect to the issue of whether appellants had standing to file the instant declaratory action.[5]

---

5. All of this said, we are somewhat bewildered by appellants' failure to take action to rectify the mix up. Even when appellee raised the issue in the instant litigation, appellants took no action to right the situation.

## III

Having denied appellee's motion to dismiss, and having determined that appellants have standing, we now must decide whether the circuit court correctly determined that appellee was not obligated to provide liability coverage under the terms of the CGL policy. As a preliminary matter, we shall present an overview of the legal principles relating to CGL policies and shall set forth the principles governing our review of the circuit court's determination.

## A

### 1

It is fair to say, for the most part, that, in the insurance industry, CGL policy provisions are generally standard. The CGL policy in the instant case provides that appellee

will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

A. **bodily injury** or

B. **property damage**

to which this insurance applies, caused by an **occurrence,** and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

---

If any such action was taken, there is no evidence of it in the record. We certainly understand how such a mix up could have happened given the similarity between the name of the insured and of Deerfield, Incorporated, but fail to understand why appellants did nothing about it.

For the sake of convenience, we shall refer to this provision as the general coverage provision. Under the CGL policy, "property damage" is defined as

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

The term "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**."

In addition to the foregoing provisions, the CGL policy contains several exclusions, the following of which are pertinent on this appeal:

This insurance does not apply:

\* \* \* \* \* \*

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the **named insured** of any contract or agreement, or

(2) the failure of the **named insured's products** or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the **named insured;**

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **named insured's products** or work performed by or on behalf of the **named insured** after such products or work have been put to use by any person or organization other than an **insured.**

(n) to **property damage** to the **named insured's products** arising out of such products or any part of such products.

The term "named insured's products" is defined by the CGL policy as "goods or products manufactured, sold, handled or distributed by the **named insured**. . . ."

Of further interest is a Broad Form Comprehensive General Liability Endorsement to the CGL policy. Included in the endorsement is exclusion VI(A)(3), which reads:

with respect to the **completed operations hazard** and with respect to any classification stated in the policy or in the company's manual as "including completed operations", to **property damage** to work performed by the **named insured** arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith.

We shall refer to this exclusion as the completed operations exclusion. The term "completed operations hazard" includes

**property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the . . . **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **named insured.** 'Operations' include materials, parts or equipment furnished in connection therewith.

Maryland courts, as well as courts from other jurisdictions, have on several occasions subjected the above policy provisions to judicial interpretation. "A hallmark of the comprehensive general liability policy is that it insures against injury done to a third party's property, in contradistinction to an 'all-risks' policy also covering losses sustained by the policy holder." *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 783, 625 A.2d 1021 (1993). The policy exclusions enumerated above are often referred to as "business risks exclusions." *Century I Joint Venture v. United States Fidelity & Guar. Co.,* 63 Md.App. 545, 553, 493 A.2d 370, *cert. denied,* 304 Md. 297, 498 A.2d 1183 (1985). In *Century I,* we noted:

Courts have uniformly held that the purpose of exclusions such as these, for damages to the insured's work product or work project out of which an accident arises, is to remove any obligation of the insured to pay for the repair or replacement of the policyholder's own defective work or defective product. Conversely, it is equally well established that such business risk exclusions permit coverage for damages to other property or for other accidental loss caused by the defective product or defective work.

*Id.* (citations omitted).

 Thus, the CGL policy insures against the risk that the insured's products or work—once relinquished or completed—will cause damage to property other than to the insured's product or completed work. *Id.* (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know,* 50 NEB.L.REV. 415, 441 (1970)). Stated differently, CGL policy coverage compensates for physical damage to the property of others, and not for an insured's contractual liability because the product or completed work supplied by the insured is not that for which the damaged third party bargained. *Id.*

 When construing a CGL policy, like any other insurance policy, the general rules of contract construction apply, including the principle that the policy must be examined as a whole. *See id.* at 555, 493 A.2d 370. *See also Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 695, 647 A.2d 1297 (1994) (citing *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766–67, 556 A.2d 1135 (1989) and *Pacific Indem. Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985)). "Absent evidence that the parties intended a special or technical meaning, words are accorded their usual, ordinary, and accepted meanings." *Id.* The ordinary meaning of a term is the meaning that a reasonably prudent layperson would give to that term. *Id.* In Maryland, courts do not construe insurance policies most strongly against the insurer, as courts in some other jurisdictions do. *Id.* As a matter of general contract construction, however, if an insurance con-

tract is ambiguous, after the court has considered any extrinsic or parol evidence, an insurance policy will be construed against the insurer as the drafter of the contract. *Id.*

## 2

■ The foregoing principles related to CGL policies must be considered in light of our standard of review on this appeal. As we noted above, in disposing of appellee's motion for judgment at the close of appellants' case, the circuit court made the determination that appellee was not obligated to provide coverage. Under MARYLAND RULE 2–519(a) (1996), "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party...." In a bench trial, the circuit court's task upon a party's motion for judgment is set forth in section (b) of this rule:

> When a defendant moves for judgment at the close of the evidence offered by the plaintiff in an action tried by the court, the court may proceed, as the trier of fact, to determine the facts and to render judgment against the plaintiff or may decline to render judgment until the close of all the evidence.

Under this rule, therefore, the trial judge in a non-jury trial is not required to view the evidence adduced in the light most favorable to the non-moving party. *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 353, 517 A.2d 1122 (1986). Thus, the trial judge assumes the function of a jury and evaluates the evidence, draws conclusions and inferences therefrom, and judges the credibility of witnesses. *Id.*

In reviewing a circuit court's grant of a Rule 2–519 motion for judgment, in a bench trial, we are guided by MARYLAND RULE 8–131(c), which reads:

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give

due regard to the opportunity of the trial court to judge the credibility of the witnesses.

*See also Pahanish,* 69 Md.App. at 353–54, 517 A.2d 1122. The "clearly erroneous" portion of Rule 8–131(c) does not apply to the legal conclusions that a circuit court draws from its factual findings. *Van Wyk, Inc. v. Fruitrade Int'l, Inc.,* 98 Md.App. 662, 669, 635 A.2d 14 (1994). Rather, the legal conclusions, based on factual findings not clearly erroneous, are reviewable by this Court. *Simmons v. B & E Landscaping Co.,* 256 Md. 13, 17, 259 A.2d 314 (1969). *See also Davis v. Davis,* 280 Md. 119, 122–26, 372 A.2d 231 (1977).

With these principles in tow, we now turn to the resolution of the question presented.

**B**

We believe that the circuit court was partially correct in determining that appellee was not obligated to provide liability coverage under the terms of the CGL policy. Therefore, we shall affirm in part and reverse in part the circuit court's grant of judgment in appellee's favor. As a result, we remand for further proceedings.

**1**

Preliminarily, we shall address appellants' contention that the circuit court's grant of the motion for judgment must be reversed because the circuit court, according to appellants, failed to consider the evidence adduced at trial, but rather based its ruling solely on the face of appellants' Trane complaint and the CGL policy. Stated differently, appellants argue that the circuit court purportedly ignored the evidence presented during the trial (evidence that appellants assert established coverage under the CGL policy) and instead improperly limited its focus exclusively to the CGL policy and the Trane complaint.

Appellants assert that we may conclude, from certain comments that the trial judge made during the hearing, that the trial court shirked its duty, pursuant to Rule 2–519(b), to

consider the evidence. In this regard, appellants point out that, in rendering its judgment, the circuit court stated that it was granting appellee's motion after a review of the CGL policy and the Trane complaint. Additionally, appellants give great weight to the following comment that the trial judge made during an exchange with appellee's counsel after the announcement of the ruling:

> COUNSEL: Your Honor, I would ask is the Court going to prepare any kind of memorandum order as to the basis for finding a lack of coverage?

> COURT: I simply recited, looking at the four corners of the document, the complaint, as well as the contract. That is it. I do not think I have to be more specific than that. It is a comparison that anyone reviewing the record can determine if they feel it is not proper. . . .

As a result of the alleged unduly restrictive manner in which the circuit court granted the motion for judgment, appellants maintain that this Court is required to reverse the circuit court.[6]

We do not share appellants' view of the manner in which the circuit court granted appellee's motion for judgment. Despite the foregoing comments of the circuit court, a fair reading of the record indicates that the court considered *all* evidence presented. Several things persuade us that the court did so. First, and most obvious, the circuit court listened to two witnesses testify and received several documents into evidence over the course of several hours of trial. It is, therefore, somewhat strained to suggest that, after having done so, the

---

**6.** To support their argument that reversal is required because the trial judge allegedly only considered the four corners of the Trane complaint and the CGL policy, without considering the evidence produced at trial, appellants heavily rely on *Aetna Casualty & Sur. Co. v. Cochran,* 337 Md. 98, 651 A.2d 859 (1995), wherein the Court of Appeals held that an insured may go beyond the allegations of the underlying tort complaint filed against it and use extrinsic evidence to establish potentiality of coverage, and therefore, establish a duty on the part of the insurer to defend. In view of our holding below, we need not determine whether the holding in *Aetna* is applicable under the present circumstances.

circuit court then proceeded to close its mind to the evidence presented.

Second, during the course of the trial, the trial judge made it known that he understood that one of his functions was to serve as fact finder. For example, when appellee's counsel moved for judgment, counsel stated, "Number 1, on the issue of coverage, there is not much to look at here. [Appellants'] own witness made clear what the case is about," to which the trial judge responded, "I understand that." Clearly, therefore, the trial judge considered and evaluated the testimony of the witnesses.

Third, and most important, the final order expressing the circuit court's judgment explicitly states, "UPON CONSIDERATION OF . . . the *evidence* presented by [appellants] at trial in this matter on June 28, 1995. . . ." (Emphasis added). That this unambiguous and subsequent written order affirmatively states that the circuit court's judgment was based upon a consideration of the evidence presented convinces us that the circuit court's ruling on the motion for judgment was not unduly restricted, as appellants allege. *Davis v. Davis*, 335 Md. 699, 646 A.2d 365 (1994), supports us in this regard:

As we have indicated, Rule 2–601 does not *require* a written order to be signed, even in complex decisions. As this case well illustrates, however, it is certainly the better practice to embody the terms of such decisions in a written order. The extemporaneous recitation of multiple or complex rulings from the bench may be fine for letting the parties and their attorneys know what the court's decision is in the case, but as it is the actual judgment that will govern the conduct, fortunes, and affairs of the parties, the court must be especially careful that the judgment itself is clear, complete, and precise. A written order prepared either by counsel (and whenever possible consented to as to form by opposing counsel) or by the court itself gives the court an opportunity to review the language, discover and correct any inadvertent imprecisions or inconsistencies, and generally assure itself that the judgment accurately reflects its decision.

*Id.* at 715, 646 A.2d 365 (quoting *Rohrbeck v. Rohrbeck,* 318 Md. 28, 46–47 n. 7, 566 A.2d 767 (1989).[7] We are satisfied that the circuit court considered the evidence produced at trial in granting appellee's motion for judgment.

### 2

 From a conceptual standpoint, the CGL policy "gives" coverage through the general coverage provision, and "takes away" coverage through the various exclusions. Thus, even if coverage would appear to exist under the general coverage provision, one must be cautious, since coverage may not, in fact, exist by virtue of an exclusion. Therefore, in determining whether coverage exists under a CGL policy, a two-part analysis is required.

Under the first part of this analysis (general coverage provision), we must determine whether there has been "property damage" caused by an "occurrence." "Property damage," as we stated, is defined in the CGL policy as "physical injury to or destruction of tangible property" or the "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence." Thus, "property damage" may take either of two

---

7. We recognize that although the circuit court signed a formal written order following the trial, such an order does not invariably preclude a finding that the circuit court's judgment was actually rendered at the hearing. *Davis,* 335 Md. at 713, 646 A.2d 365. In light of the facts, however, that the trial judge stated that he would sign an order submitted by counsel, and that the June 30, 1995 docket entry reflecting the circuit court's ruling explicitly states, "ORDER TO BE SUBMIT-TED," we may conclude that the circuit court did not intend for its extemporaneous bench ruling to represent the final judgment in the case. *Id.*

In a related vein, appellants contend that the circuit court's refusal to sign a proposed order that appellee submitted (containing four pages of extensive factual determinations), and its decision instead to sign the " 'bare bones' order submitted by Appellants," indicates that the circuit court did not consider the evidence adduced at trial. In our view, however, appellants are reading too much into the circuit court's refusal to sign the proposed order. There could have been a number of reasons for the circuit court to refuse to sign the proposed order, including that the circuit court may not have agreed with each and every one of the myriad of findings contained in that proposed order.

forms: physical destruction or loss of use of property. In the instant case, the unrebutted evidence shows that appellants have sustained both forms of "property damage."

Appellants unquestionably established there has been "physical injury" or "destruction" to the HVAC system (and its component parts). To this extent, therefore, we do not dispute appellants' contention that the "property damage" in this case has taken the "form of broken capillary tubes, burnt out compressors, damaged pipes, contaminated [HVAC] systems ... [and], failure of an entire heating and air condition system...."

Establishing that the HVAC system was physically injured or destroyed is only one step in the analysis under the general coverage provision. Appellants also have to show that the property damage to the HVAC system was caused by an "occurrence," i.e. an "accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." Courts uniformly hold that when property damage arising out of the insured's defective workmanship is confined to the insured's own work product, the damage is not caused by an "occurrence" within the meaning of the CGL policy. *See J.Z.G. Resources, Inc. v. King,* 987 F.2d 98, 102–03 (2d Cir.1993); *Reliance Ins. Co. v. Mogavero,* 640 F.Supp. 84 (D.Md.1986) (applying Maryland law). *See also, e.g., First Mercury Syndicate, Inc. v. Telephone Alarm Sys., Inc.,* 849 F.Supp. 559, 566 (E.D.Mich.1994) ("when the damage arising out of the insured's defective workmanship is limited to the insured's own work product, the insured is the injured party, and the damage is not viewed as accidental within the meaning of the policy."); *Hawkeye–Security Ins. Co. v. Vector Constr. Co.,* 185 Mich.App. 369, 460 N.W.2d 329, 333–34 (1990) (damage to the insured's work product caused by the insured's defective workmanship was not the result of an occurrence). In light of the contract between appellants and the insured, there can be no doubt that the HVAC system, whether considered as a whole or in terms of its various component parts, is the work product of the insured.

Consequently, appellee is not obligated to pay appellants for "damages because of . . . property damages" to the HVAC system, because such damage was not caused by an "occurrence." Specifically, therefore, appellants may not recover for costs associated with tearing out walls, molding, and carpeting in order to repair and remove the HVAC units.[8] Nor may appellants recover for the costs to replace and repair the defective HVAC systems. Similarly, appellants may not recover for the economic costs of paying consultants, or the economic costs associated with loss of management time. Indeed, because the property damage to the HVAC systems was not caused by an occurrence, appellants are not entitled to recover any of the economic or consequential damages that they may have sustained as a result of the property damage to the HVAC systems.

In any event, even if coverage were possible under the general coverage provision, appellants could not recover

---

**8.** We reject appellants' suggestion that there was "property damage" to the walls, molding, and carpeting in the suites. Simply stated, no such evidence was presented—not during the hearing below and not during the Trane default judgment damages hearing. For example, appellants produced no evidence that fluids leaked out of the HVAC system and ruined walls or carpeting in the hotel. Voluntarily pulling up carpeting or breaking through dry-wall to access the HVAC units is not property damage; it is the cost incurred in replacing and repairing the HVAC systems. Even if it could be considered "property damage," we would hold that it was not caused by an "occurrence," because the so-called damage was not accidental. To be sure, these are "damages" under the CGL policy that have resulted from "property damage" to the HVAC system, but they are not, in and of themselves, "property damage."

In this regard, appellants have failed to appreciate the critical difference under the CGL policy between "damages," on the one hand, and "property damage," on the other hand. As we have demonstrated, the CGL policy defines the term "property damage." The term "damages," however, is not defined in the CGL policy. In *Bausch & Lomb*—where the term "damages" also was not defined in the general coverage provision of a CGL policy—the Court of Appeals determined that "damages" should be interpreted according to its ordinary dictionary meaning. 330 Md. at 780–82, 625 A.2d 1021. The Court, therefore, held that "damages" means the money estimated for reparation for an injury sustained or the money paid to make good on an insurance loss. *Id.*

for damages associated to the property damage to the HVAC system by virtue of exclusion (n). As set forth above, under exclusion (n), the CGL policy "does not apply" "to **property damage** to the **named insured's products** arising out of such products or any part of such products." The term "named insured's products" is defined by the CGL policy as "goods or products manufactured, sold, handled or distributed by the **named insured....**" The damaged HVAC units and the various other damaged parts of the HVAC system clearly fall within this broad definition of "named insured's products." Appellants implicitly acknowledge this fact. In their brief, they state:

> Pursuant to a contract between [appellants] and Deerfield, Deerfield was to purchase and install the HVAC system for the Woodfin Suites Hotel. Deerfield purchased the HVAC systems from The Trane Company....

Consistent with this representation, Kruse testified at trial that Deerfield was employed to install the hotel's HVAC and plumbing systems. Thus, because appellants are seeking from appellee "all sums which the insured shall become legally obligated to pay as damages because of ... property damage" to the "named insured's products," the CGL policy "does not apply."

Appellants argue, however, that exclusion (n) does not apply because the

> damage which resulted was far more than the "work product" itself. The damage clearly extended to third party property of the [appellants]—starting with the failure of the HVAC units and system once Deerfield completed the installation and relinquished the work product to [appellants], and the consequent damage to [appellants'] hotel suites' walls, piping and carpeting as the failed HVAC units were ripped out of the suites. Since Deerfield's work product itself was not damaged, exclusion (n) is not applicable.

This argument is faulty on three levels. First, the CGL policy does not make the transfer of ownership distinction contained in appellants' argument. That the insured relinquished the

work product to appellants after installing the HVAC system does not mean that the products are no longer the "named insured's products." The definition of "named insured's products" includes products that are "sold" or "handled" by the insured. As we noted, Deerfield was responsible for supplying an entire HVAC system for the hotel. Thus, the entire HVAC system was the "product" that was supplied to appellants under their contract with the insured. *See, e.g., Century I*, 63 Md.App. at 555, 493 A.2d 370 (because the term "named insured's product" in a CGL policy is not restricted to just goods, but includes "something produced" under an ordinary dictionary meaning, an individual condominium unit is a product sold by the named insured (a condominium developer)).[9]

Second, as we already explained, the ripping out of the hotel's walls, molding, and carpeting by appellants to replace the failed units was not "property damage" within the meaning of the CGL policy. Finally, we reject appellants' assertion that the insured's work product (the HVAC system) was not damaged. All along, appellants have claimed that various parts of the HVAC system became physically damaged ("broken capillary tubes, burnt out compressors, damaged pipes").

Consequently, we affirm the circuit court to the extent that it determined that appellants were not entitled to damages resulting from the property damage to the HVAC systems. The property damage to the HVAC system, however, is not the only property damage involved in this case. Appellants put forth undisputed evidence that they lost the use of guest suites as a result of the breakdown to the HVAC system. At this stage of the trial, appellee had not challenged appellants' position or denied that the hotel lost the use of suites because of the HVAC failures. Therefore, under a plain reading of the CGL policy, appellants have established the "loss of use of tangible property." As noted above, in order for the loss of use of the guest suites to be compensable under the general

---

9. Even if the transfer of ownership rendered the HVAC system no longer the "named insured's products," coverage would be excluded under the "completed operations hazard" exclusion.

coverage provision of the CGL policy, such loss of use must have been caused by an "occurrence."

■ Unlike the HVAC systems, the guest rooms are not the work product of the insured, but are the property of appellants. In other words, at least with respect to the loss of use of guest suites, the damage is to property other than the product or completed work of the insured. To the extent that the insured's defective workmanship causes damage to such other property, courts uniformly hold that such damage is caused by an "occurrence," and is, therefore, compensable under the CGL policy. *See King,* 987 F.2d at 102–03; *Hamilton Die Cast, Inc. v. United States Fidelity & Guar. Co.,* 508 F.2d 417, 420 (7th Cir.1975) ("If one of the completed [tennis] rackets had broken during normal use due to the defective frames and a person or an item of property had been harmed, it seems clear that there would have been an 'occurrence' and that defendant would have had responsibility for plaintiff's defense. Such a situation would clearly be 'an accident.' The policy does not, however, cover 'an occurrence of alleged negligent manufacture'; it covers negligent manufacture that results in 'an occurrence.'"); *First Mercury Syndicate, Inc.,* 849 F.Supp. at 565–66; *Vector Constr. Co.,* 460 N.W.2d at 333–34. *Cf. Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 796 (1979) (a CGL policy "does not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident."). This principle is wholly consistent with Maryland law. *See Century I,* 63 Md.App. at 553, 493 A.2d 370 (the risk intended to be insured by a CGL policy is the possibility that the insured's work product, once completed, will cause damage to property other than to the insured's work product).

The loss of use of the guest suites, therefore, is "property damage" caused by an "occurrence" under the CGL policy. As a result, in light of the evidence thus far introduced, under the general coverage provision, appellee is obligated to cover the "damages" associated with the loss of use of the guest suites. Also, in light of the evidence thus far introduced, the

exclusions upon which appellee rely do not operate to relieve appellee of its obligation to provide coverage for damages from the loss of use of the hotel's guest suites. Exclusion (m), by its very terms, does not apply to the loss of use of the hotel suites:

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the **named insured's products** or work performed by or on behalf of the **named insured** after such products or work have been put to use by any person or organization other than an **insured.**

Similarly, a plain reading of exclusion (n) indicates that this exclusion does not apply because it denies coverage for property damage to the named insured's property (HVAC system)—whereas we are currently dealing with property damage (loss of use of hotel suites) to the property of a third party (appellants). For essentially the same reason, the completed operations hazard exclusion does not deny coverage for damages from the loss of use of the hotel's guest suites.

Consequently, we hold that appellee's motion for judgment should not have been granted with respect to coverage under the CGL policy for the damages from the loss of use of the hotel suites. At the close of appellants' case in the circuit court, appellant presented undisputed evidence that the HVAC failures caused the hotel to suffer damages from the loss of use of rooms. Therefore, we reverse the judgment of the circuit court on that issue. Given the procedural posture of this case, however, remand is necessary to afford appellee the opportunity to put on its case and attempt to show why it should not be responsible for such coverage.

For the benefit of the circuit court and the parties upon remand, we make the following observations. Most obviously, as appellants have alleged, the damages resulting from the loss of use of the hotel suites consisted of lost revenues, i.e., lost income from paying guests that the hotel had to turn away, offset by the hotel's savings in cost. We observe that this amount was previously established in the Trane litigation

**654**

by the circuit court in the damages hearing attendant to the default judgment against the insured. As we have stated, the total amount of the default judgment was $168,102.84. The transcript from the default judgment damages hearing reveals that this total comprised the following: (1) $4,000 paid to a consultant hired to identify the HVAC problems, (2) $41,000 paid to a contractor that repaired the HVAC system, (3) $14,896.92 for in-house labor costs associated with the hotel's employees responding to and repairing the HVAC failures, (4) $11,795.72 for expenses incurred by the president of HCC in travelling to the hotel and personally inspecting the HVAC system, and (5) $96,415.20 [10] for the hotel's loss of income from unavailable suites offset by the savings in expenses.[11] Based on our foregoing discussion, if after appellee presents its case the circuit court determines that appellee is, in fact, responsible under the CGL policy for the damages from the loss of use of the hotel suites, we believe that appellee would be liable only for the last item. The other items are damages associated with property damage to the HVAC system and are, therefore, not covered under the CGL policy.

We believe that, upon remand, if the circuit court ultimately enters judgment against appellee after appellee has presented its case, the circuit court is constrained by the judicial determination made in the Trane litigation that $96,415.20 is the amount of damages associated with the loss of use of the guest suites. In other words, we do not believe that appellants may attempt to establish a different amount as its damages principally because in an injured party's direct action against the

---

10. The circuit court accepted that the total lost gross revenues were $120,519. The circuit court, however, discounted that figure by twenty percent (or $24,103.80) to account for the cost savings. When this is done, lost net income is $96,415.20.

11. Adding these items yields a total of $168,107.84. The amount of the default judgment against the insured, however, is $168,102.84. Apparently, the circuit court must have made a calculation error because there is a $5 difference between the amount of the default judgment and the actual total of the itemized costs. This mistake went unnoticed at the hearing.

insurer based on a judgment previously obtained by the injured party against the insured, the injured party's recovery against the insurer is limited to the amount of that judgment, to the extent the judgment does not exceed policy limits. *See* MD.ANN.CODE art. 48A, § 481, and our discussion related thereto, *supra* Part II. Our instructions are not intended to limit or restrict the circuit court with respect to an award for costs, attorneys fees, or interest. Accordingly, the circuit court may make whatever award it deems appropriate in this regard.

## IV

Finally, appellee argues that, even if we conclude that appellants have standing and that coverage exists under the CGL policy, appellee "is still entitled to disclaim any obligation pursuant to the policy due to actual prejudice occasioned by the insured's failure to comply with the notice and cooperation conditions specifically delineated in the policy." Upon our review of the record, we hold that the circuit court was not clearly erroneous in determining that appellee was not prejudiced by the insured's failure to notify the insurer of appellants' claim or by its alleged failure to cooperate with appellee with respect to the claim.

Under the CGL policy, in the event of a claim, the insured must provide written notice to appellee containing sufficiently detailed information regarding the circumstances surrounding the claim and the individuals involved. If the insured is sued, the insured must immediately forward all court papers to appellee. In addition, the insured is required to cooperate with and assist appellee with respect to settlements, trials, and obtaining evidence.

In order for an insurer to disclaim coverage for the insured's lack of cooperation or notification, the insurer must establish, "by a preponderance of affirmative evidence, that such lack of cooperation or notice has resulted in actual prejudice to the insurer." MD.ANN.CODE art. 48A, § 482 (1994). *See General Accident Ins. Co. v. Scott,* 107 Md.App.

603, 614, 669 A.2d 773 (1996), *cert. denied,* 342 Md. 115, 673 A.2d 707 (1996). Appellee claims that the insured violated the notice and cooperation provisions of the CGL policy, and that appellee was actually prejudiced thereby. Accordingly, appellee maintains that it may disclaim coverage under the CGL policy. In this regard, appellee states:

> In this instance, the Appellants claim that the loss occurred in 1988. The Trane litigation was instituted in January of 1990. The [appellants] obtained a default judgment against Deerfield, Inc. in 1992. [Appellee's] insured ... never informed [appellee] of the possibility of an occurrence, claim or lawsuit falling within the policy period. Moreover, the first [appellee] heard of any potential claim was when it received a letter from Appellants' counsel in June, 1994, more than six years after the date of loss and two years after the entry of a judgment by default.
>
> \* \* \* \* \* \*
>
> In support of their argument that [appellee] has not suffered actual prejudice, the Appellants point to the fact that they offered to vacate the default judgment against Deerfield, Inc. and, in addition, have offered to share with [appellee] the discovery conducted thus far. What the Appellants fail to realize is that their offers cannot eliminate or ameliorate the actual prejudice suffered by [appellee]. Notwithstanding the Appellants['] "offer" to allow [appellee] to review their discovery files, the information sought by and of significance to them in *pursuing* a claim would clearly not be beneficial to the defense efforts at this late stage. More importantly, ... during his *de bene esse* deposition just prior to the June 28, 1995 trial, Don Paulgaard testified that he has absolutely no idea how to locate the various Deerfield employees who worked on the jobsite and cannot even remember their names. Mr. Paulgaard further testified that he knew this information back in 1988, the date of the alleged loss. Even if the names of the employees were available and they could be located, certainly their respective recollections of the facts and circumstances surrounding the alleged failure of the HVAC system

will have long since diminished. There is absolutely nothing that can be done at this juncture in the proceeding to give back to [appellee] what has been forever lost—the opportunity to investigate the alleged loss in a timely, efficient, and expedient manner. Witnesses are definitely lost and memories have surely faded.

Appellee relies heavily on *Washington v. Federal Kemper Ins. Co.*, 60 Md.App. 288, 297, 482 A.2d 503 (1984), wherein we affirmed the trial court's determination that the insurer was prejudiced by the insured's failure to notify the insurer of the loss until approximately one month after a verdict was entered against the insured. In so doing, we recognized that it was impossible for the insurer to show what witnesses it might have discovered, what defenses it might have asserted, or what settlement disposition it might have reached if it had received notice before the verdict was rendered against the insured. *Id.* at 295–96, 482 A.2d 503. On its surface, *Washington* is seemingly supportive of appellee's position. *Washington*, however, is distinguishable from the instant case on a very important basis.

In the instant case, there is evidence that appellee had the opportunity to petition the circuit court in the Trane litigation to set aside the default judgment. The trial court correctly determined that final judgment in the Trane litigation did not occur until February 21, 1995, when appellants' claims against Trane and Climatemaster were dismissed by Judge Mason. *See Quartertime Video & Vending Corp. v. Hanna*, 321 Md. 59, 63, 63 n. 4, 65, 580 A.2d 1073 (1990) (trial court had authority to vacate a default judgment entered against one of multiple defendants until such time as a final judgment was entered in the case disposing of all claims of all parties). A default judgment against one of multiple defendants is an interlocutory order subject to the circuit court's full discretionary revisory power until such time as a final judgment is entered in the action disposing of all claims and parties. *Id.* at 63–66, 580 A.2d 1073. Thus, even though default judgment was entered against the insured in 1992, in

1994 (when appellee first learned of the claim), appellants and appellee could have—pursuant to appellants' "offer"—jointly petitioned the circuit court to revise the default judgment. Rather than at least attempting such a course of action, appellee chose to rest on the technical defense of lack of cooperation and notification. In contrast, the insurer in *Washington* did not have the benefit of this type of post-judgment control.

In view of this level of control over the proceedings, appellee's claim of prejudice from lack of timely notice and cooperation loses much of its punch. As we recently made clear in *General Accident,* 107 Md.App. at 615, 669 A.2d 773, actual prejudice may not be presumed from the mere passage of time—even when notification to the insurer occurred almost two and one-half years after the accident. In the instant case, we observe that Ohler acknowledged that appellee undertook no investigation into the facts of the loss beyond reviewing appellants' Trane complaint, and we agree that, apart from what was alleged in that complaint, he had no knowledge about the manner in which the HVAC system was installed or the manner in which the HVAC goods were handled. He further testified regarding appellee's total failure even to attempt to investigate the claim. In light of these facts, we find the following excerpt from *General Accident* to be illuminating:

General Accident contends that it could not take "timely" statements from witnesses. But it never asserted that it tried to interview witnesses and was unable to do so. General Accident does not identify even a single person who was unavailable due to the lapse of time. Nor does it identify any particular witness who suffered memory losses, died, or were otherwise unavailable. Further, General Accident did not articulate any difficulty in using the witness statements that had already been obtained by other interested parties.

It is also important to our analysis that, although appellant claims that it could not investigate the scene of the accident, it makes no claim that it ever attempted to investi-

gate the accident or that important evidence disappeared. Nor does appellant identify with any particularity what material evidence is unavailable or how it was actually prejudiced as a result. An insurer cannot assert prejudice with regard to its ability to conduct an investigation that it never tried to conduct.

*Id.* at 616–17, 669 A.2d 773 (citations omitted). In *General Accident,* we also noted that the insured repeatedly offered to assist the insurer in its investigations and extended full access to the insured's investigation, but the insurer declined. *Id.* at 617, 669 A.2d 773. In a similar regard, appellants offered appellee full access to their files. On the basis of *General Accident,* in tandem with the fact that appellee had significant post-judgment control, the circuit court's factual determination of lack of prejudice to appellee may be affirmed as not being clearly erroneous.

Given the procedural posture of this case, however, appellee is entitled to present evidence on remand to the circuit court to support its position with respect to actual prejudice and lack of cooperation and notice. As appellee pointed out to this Court, the circuit court decided this matter against appellee on a motion for judgment under MARYLAND RULE 2–519 at the close of appellants' case. Appellee correctly observes that the circuit court's ruling does not foreclose appellee from presenting such evidence during the presentation of its defense to appellants' lawsuit.

## CONCLUSION

We summarize our holdings as follows: (1) appellee's motion to dismiss this appeal is denied; (2) appellants presented sufficient evidence demonstrating that they had standing to bring the instant action; (3) the circuit court's grant of the motion for judgment is affirmed to the extent that it determined that, under the CGL policy, appellee is not obligated to cover the damages from the property damage to the HVAC system but is reversed to the extent that it determined that appellee is not required to cover the damages (lost income)

from the loss of use of the guest suites; (4) as a result of (3), the case is remanded to the circuit court for appellee to present its defense case on this issue of coverage; and (5) the circuit court's denial of appellee's motion for judgment with respect to lack of prejudice is affirmed and on remand appellee may present its defense case with respect to actual prejudice and lack of cooperation and notice.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE HALF BY APPELLANTS AND ONE HALF BY APPELLEE.