707 A.2d 906

**LERNER CORPORATION et al.**

v.

**ASSURANCE COMPANY OF AMERICA et al.**

**No. 362, Sept. Term., 1997.**

Court of Special Appeals of Maryland.

April 2, 1998.

Howard G. Goldberg and Gary E. Dumer, Jr. (Smith, Somerville & Case, L.L.C., on the brief), Baltimore, for appellants.

Edward M. Buxbaum (Whiteford, Taylor & Preston) and George D. Bogris (Daniel W. Whitney, and Howell, Gately, Whitney & Carter, L.L.P.), Towsend, (Richard R. Page and Cain & Wyrough, Upper Marlboro, on the brief), for appellees.

Argued before DAVIS, THIEME and KENNEY, JJ.

KENNEY, Judge.

On June 8, 1995, appellants, Lerner Corporation (Lerner) and White Flint Limited Partnership (White Flint) (collectively, the "Insureds"), filed a two count complaint against appellees, Continental Insurance Company, Assurance Company of America, Hartford Accident and Indemnity Company, Maryland Casualty Company, and Northern Insurance Company of New York (collectively, the "Insurers"). Count I alleged that the Insurers violated their respective contracts of commercial general liability insurance (the "Policies") with the Insureds. In Count II, the Insureds sought a declaratory judgment that the Insurers were obligated to provide indemnity to the Insureds for the costs incurred by the Insureds in repairing the facade to a building that had been sold by White Flint to the General Services Administration of the United States of America ("GSA").

An amended complaint containing essentially the same allegations was filed on or about December 18, 1995. In response, the Insurers filed motions for summary judgment stating that Comprehensive General Liability ("CGL") policies do not provide coverage for the Insureds' economic losses

arising out of breach of contract and, in addition, that any alleged damages were specifically excluded under the provisions of the policy.

On January 8, 1997, a motion hearing was held in the Circuit Court for Baltimore County. The circuit court granted the motions for summary judgment filed by the Insurers and entered final judgment on the ground that the damages alleged by the Insureds arose out of a breach of contract and were, consequently, not covered by a CGL policy. On January 16, 1997, the court issued a written declaration, holding that the Insurers were not liable for the Insureds' alleged damages under the terms of the CGL policies. This timely appeal was subsequently filed.

The Insureds raise two questions on appeal:

I. Did the circuit court err by granting summary judgment on the ground that a comprehensive general liability policy never provides coverage for property damages arising out of a breach of contract?

II. Did the circuit court err when it ruled that the damages of the Insureds did not arise in tort, and thereafter granted summary judgment solely on the ground that a comprehensive general liability policy never provides coverage for property damages arising from breach of contract?

We have condensed and rephrased these questions to the following single question:

I. Were the appellants entitled to indemnity for the costs associated with the contractually obligated repair of a latent construction defect under the comprehensive general liability polices issued to the appellants?

### Factual Summary

In 1984, White Flint began development of a parcel of land located in Rockville, Maryland, on which was constructed an office building to be known as the One White Flint North Building (the "Building"). Lerner provided construction management services to White Flint, but neither Lerner nor White Flint performed any of the actual construction work on

the project. Salus Corporation ("Salus") acted as the general contractor and all construction work on the Building was performed by subcontractors.

The exterior facade of the Building consists of marble and stone veneers that are attached to precast concrete panels. Beginning in 1984, marble stones were shipped to the job site by Vermont Marble Company (Vermont) and granite stones were shipped by Cold Spring Granite Company. Once the stones arrived at the site, TecFab of Maryland, Inc. (TecFab), the precast subcontractor, inserted metal anchors into holes in the backs of the stones and then poured concrete into forms over the backs of the stones to create the stone-clad panels.

In approximately November 1985, it was discovered that certain stones attached to the precast panel had become loose. Over the next several months Salus, TecFab, and Vermont worked together to devise a method to repair the Building's facade. The repair activities were implemented in the spring of 1986, and continued through late Fall 1986. In Fall 1986, the facade of the Building was inspected by Law Engineering and determined to be structurally sound.

While the facade was being repaired, White Flint entered into a contract to sell the Building to the United States of America, acting through GSA. Although GSA acknowledged that the exterior of the facade was substantially complete, the contract of sale contained a provision which provided that the "acceptance by the United States of the work to be performed hereunder shall be final and conclusive except as regards latent defects, fraud, or such gross mistakes as may amount to fraud, or as regards any warranty or guaranty hereunder."

In early 1991, GSA discovered that the facade panels were deteriorating. On or about April 15, 1993, GSA notified White Flint by letter that "the facade deficiencies identified are the apparent result of latent defects in the attachment of the marble to the precast panel, a condition which existed at the time of acceptance, but which was not discoverable by reasonable inspection." On or about August 10, 1993, GSA formally rescinded acceptance of the facade of the Building in accor-

dance with the latent defect provision of the April 8, 1986, contract for sale, and demanded that White Flint repair the deficiencies. Alternatively, GSA indicated that it would accept bids on the project and hold White Flint responsible for the costs incurred.

Thereafter, the Insureds retained the engineering firm of Raths, Raths and Johnson ("Raths") to determine the scope and extent of the facade deficiencies and to recommend repair methods. Raths's investigation revealed that a number of deficiencies in the attachment of the stones to the precast panels prevented the facade from withstanding the effects of time and the elements. Under the guidance of Raths, the Insureds then undertook the action necessary to repair the facade. GSA, consequently, took no legal action against the Insureds.

The Insureds, subsequently, filed a claim with the Insurers, asserting that the costs associated with repairing the damaged facade were covered under its commercial general liability ("CGL") policies. The Insurers denied coverage, stating that the alleged damages arose out of the Insured's breach of a sale contract with GSA and were not covered under the applicable CGL policy.

## DISCUSSION

### I.

### SUMMARY JUDGMENT

The trial court, in granting a motion for summary judgment, does not resolve factual disputes, but is instead limited to ruling as to matters of law. *Sheets v. Brethren Mut. Insur. Co.*, 342 Md. 634, 638, 679 A.2d 540 (1996). The standard for appellate review of a trial court's grant of summary judgment is whether the trial court was legally correct. *Id.* Thus, in the present case, we must examine whether the trial court was legally correct in holding that the Insurers did not have a duty to indemnify the Insureds for the costs expended to repair the Building's facade.

In granting the Insurers' motions for summary judgment, the circuit court, referring specifically to this Court's holdings in *Century I Joint Venture v. United States Fidelity & Guaranty Co.*, 63 Md.App. 545, 493 A.2d 370 (1985), and *Woodfin Equities Corp. v. Harford Mutual Insurance Co.*, 110 Md.App. 616, 678 A.2d 116 (1996), *rev'd*, 344 Md. 399, 687 A.2d 652 (1997), held:

> Now, it seems to me that if I were to deny these motions based upon some theory that perhaps breach of contract liability is covered by comprehensive general liability policies, I would be inclined in the teeth of the two cases that were specifically mentioned, that is, both the *Century I* case and the much more recent case of *Woodfin*, which quote with favor a Nebraska Law Review article, and as far as I can tell, essentially adopt that view as Maryland law to the extent that it hasn't been adopted before.
>
> Contractual liability policy coverage compensates for physical damage to the property, of course, and not for the insured's contractual liability because the property or completed work completely insured is not that for which the damaged third-party bargained; in this case, meaning the Government. Now, it seems to me there could be no clearer statement of policy that could be made, than that. And if I were to rule otherwise, it seems to me that I would be committing reversible error.

In *Century I,* this Court held that an insurer was not required to indemnify and/or defend a condominium developer against claims of defective workmanship made by the individual condominium owners. In *Woodfin,* we held that a subcontractor was not entitled to coverage under a CGL policy when the damages asserted related to the insureds' own work product and not damage to the property of others. In both cases, we recognized, in determining whether coverage is provided under a CGL insurance policy, that

> [t]he risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for

which the insured may be found liable.... The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Century I*, 63 Md.App. at 553–54, 493 A.2d 370 (quoting Roger C.Henderson, *Insurance Protection For Products Liability And Completed Operations—What Every Lawyer Should Know*, 50 NEB. L. REV. 415, 441 (1970) (citation omitted)); See also *Woodfin*, 110 Md.App. at 642, 678 A.2d 116.

 We believe the circuit court's order of summary judgment was legally correct, and, for the reasons set forth below, we hold that the damages claimed, regardless of the form of the cause of action that GSA might have maintained against the Insureds to repair the faulty construction of the facade, were not covered by the CGL policies issued to the Insureds and that the Insurers were not obligated to indemnify the Insureds for the costs incurred related to the repair of the Building's damaged facade. This case does not require that we address the broader question of whether or under what circumstances damages flowing from a breach of contract claim can ever be recovered under a CGL policy.

Our review necessarily begins with an examination of the relevant insurance policies. The record indicates that, between 1985 and 1995, the Insureds purchased ten separate CGL policies from the Insurers, each of the which modeled the standard CGL policies issued by the Insurance Services Office (ISO). The policies issued for 1985–86 and 1986–87 were 1973 Standard Form Policies, and all other applicable policies were 1986 Standard Form Policies. The insuring agreement of the 1973 ISO policy reads, in pertinent part,

[The Insurer] will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of

A. bodily injury

B. property damage

to which this insurance applies, caused by an occurrence, and [the Insurer] shall have the right to defend any suit against the Insured seeking damages on account of any such bodily injury or property damage, ..., and may make such investigation and settlement of any claim or suit as it deems expedient....

The 1986 ISO policies provide, in pertinent part,
that [the Insurer] will pay those on behalf of the Insured "all sums which the Insured shall become legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."

Both the 1973 and 1986 policies limit coverage to "property damage" and "bodily injury" caused by an "occurrence." "Occurrence" is defined by the 1973 policy as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the Insured." The 1986 ISO policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The Insureds assert that the cracking and loosening of the stone veneer to the Building's facade constituted "property damage." Because the deterioration of the facade resulted from the continuous and repeated exposure to harmful conditions (i.e. the effects of weather and time on faulty workmanship and materials), the resulting "property damage" was caused by an "occurrence," as that term is defined in the policy. The damage is third-party property damage because the Building is no longer owned by an Insured. Citing *Pyles v. Pennsylvania Manufacturers' Assoc. Ins. Co.*, 90 Md.App. 320, 600 A.2d 1174 (1992), *cert. denied*, 326 Md. 662, 607 A.2d 7 (1992), the Insureds maintain that there existed a sufficient "causal nexus" between the occurrence and the damages to obligate the insurer to provide coverage under the policy.

Stated somewhat differently, the appellants' position appears to be that when the breach of the contract is "property damage," the damages are covered by their CGL liability

policy. Therefore, in the context of the sale of the Building, the costs associated with correcting the latent defect, which is the contract deficiency, would become a covered claim under the CGL policy. If appellants' analysis is correct, the CGL policy under such circumstances takes on the characteristics of a performance bond or warranty.

The appellees point out that the "causal link" analysis in *Pyles* is traditionally part of a tort liability analysis and argue that "the liability to GSA was not for property damage but for a failure to perform a contract obligation." In other words, the cracked and loose stone veneer was simply a physical manifestation of the breach of contract and that, in fact, the appellants' liability for repair was not causally related to any conduct of appellants, which performed no construction work on the defective facade. In other words, absent the contract obligation, appellants would have no liability to GSA for damages.

The Insureds assert that the trial court improperly relied on our holdings in *Century I* and *Woodfin*. They claim that the holding in *Century I* is inapplicable because it dealt exclusively with an interpretation of a 1973 ISO Standard Form policy. The Insureds point out that only the two earliest CGL policies in the present case are based on this form; the rest are based on the 1986 ISO Standard Form. With regard to the applicable differences between the 1973 and the 1986 forms, the Insureds indicate that the 1986 form omits "real property" from the definition of "your product" under those items specifically excluded from coverage and, thus, is of little applicability to this case. The Insureds state that *Woodfin* is inapplicable because that case was reversed by the Court of Appeals in *Harford Mutual Insurance Co. v. Woodfin Equities Corp.*, 344 Md. 399, 687 A.2d 652 (1997).

Although we do not believe that the Court of Appeals necessarily rejected our coverage analysis in *Woodfin*, we acknowledge that *Century I* and *Woodfin* focused primarily on the application of certain CGL policy exclusions. The present analysis of this case does not turn on those exclusions, but,

rather, on the insuring clause of the policies and whether the damages claimed by the Insureds result from an "occurrence" under the terms of the policy. Nevertheless, we still find both *Century I* and *Woodfin* instructive on the interpretation of CGL policies generally.

At oral argument, the Insureds argued that the Court of Appeals holding in *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 625 A.2d 1021 (1993), supports a reversal of the trial court's grant of summary judgment. In *Bausch & Lomb*, the Court considered the applicability of general liability insurance coverage to environmental cleanup costs. Bausch & Lomb notified its insurer, Utica, after discovering that its on-site disposal of industrial chemicals had contaminated the soil and ground water at one of its plants. Bausch & Lomb sought indemnification for the costs associated with testing and abatement of the site. Utica declined to provide coverage, stating that such damages were not covered under the CGL policy.

The Court found initially that environmental cleanup costs could constitute "damages" under the CGL policy, but further held that a general liability policy covers only those damages to the property of others. *Bausch & Lomb*, 330 Md. at 788, 625 A.2d 1021. Because the Court found the State's interest in ground water to be regulatory and not proprietary, ground water contamination did not constitute third-party property damages. *Id.* The Utica policy did not provide coverage for economic loss apart from third party damages.

*Bausch & Lomb* affirms the proposition that coverage under a CGL policy is triggered only when an "occurrence" results in "property damage" to a third party. Although the Court determined that the accidental long term release of chemicals into the soil and ground water may constitute an "occurrence," it found that coverage was not provided because the "occurrence" did not cause any damage to a third party. Because we do not find a property owner's unintended contamination by ongoing chemical waste disposal to be analogous to the Insureds' sale of the Building with a latent defect, the finding

of a covered "occurrence" in *Bausch & Lomb* does not mandate the finding of a covered "occurrence" in the instant action.

Our analysis directs us, instead, to *Sheets v. Brethren Mutual Insurance Co.*, 342 Md. 634, 679 A.2d 540 (1996), in which the Court of Appeals recently considered when an "accident" constituted an "occurrence" under a general liability policy. *Sheets* was decided on July 26, 1996, approximately one month after our decision in *Woodfin.* See also *Lords Landing Village Condominium Council of Unit Owners v. Continental Insurance Company,* —— U.S. ——, 117 S.Ct. 1731, 138 L.Ed.2d 91 (1997). In *Sheets,* the purchasers of a farmhouse brought suit against the sellers, alleging that the sellers had negligently misrepresented that the septic system at the farmhouse was in "good working condition." The purchasers with their 9 children moved in and within 3 weeks the system failed causing effluent to flood the walk area of the house. The health department condemned the failed system, requiring a replacement at a cost exceeding $12,000. The Sheetses settled with the purchasers, but because the settlement basis (intentional or negligent misrepresentation) was not before the Court of Appeals, the Court addressed only the insurer's duty to defend.

In its analysis, the Court commented on the concept of "property damage" and noted that it was conceded in *Sheets* "that the money spent to fix the system was economic loss and thus not covered under the policy as property damage." *Sheets,* 342 Md. at 645, 679 A.2d 540. On the other hand, "loss of use" was covered. *Id.*

After a thorough analysis of case law from sister jurisdictions, and an acknowledgment of a lack of clarity in earlier opinions, Judge Chasanow, writing for the Court, stated that "an act of negligence constitutes an 'accident' under a liability insurance policy ... when a negligent act causes damage that is unforeseen or unexpected by the insured." *Id.* at 652, 679 A.2d 540. This approach, he points out, is "most in accord with the reasonable expectation of the average purchaser of

general liability insurance of the contract language," *Id.* at 652–53, 679 A.2d 540 (citing 1A INSURANCE LAW AND PRACTICE § 360 at 447 ("An average person buying a personal accident policy assumes that he is covered for any fortuitous and undesigned injury.")). In finding that negligent misrepresentation can be covered as an "accident," the Court stated that "the ultimate inquiry is whether the resulting damage is 'an event that takes place without one's foresight or expectation.'" *Sheets,* 342 Md. at 657, 679 A.2d 540 (citation omitted).

This case is distinguishable from *Sheets.* Despite the Insureds' assertions, the record does not reflect, nor was it argued below, that GSA made any claim against appellants based on negligent misrepresentation. Rather, GSA's only claim was for breach of contract. Assuming, *arguendo,* that GSA had made a negligent misrepresentation claim against the Insureds, we would find that summary judgment was still appropriate in this case. Under *Sheets,* there is an occurrence under the CGL policy only upon the happening of an "accident." *See Sheets, supra.* We do not believe that appellants' liability to repair the Building's facade resulted from an "accident" but simply from its failure to satisfy its obligation under their contract. Damage to the facade of the Building caused by a latent defect should not be deemed unexpected or unforeseen. Certainly, the obligation to repair the facade itself is not unexpected or unforeseen under the terms of the sales contract. Therefore, the repair or replacement damages represent economic loss and consequently would not trigger a duty to indemnify under a CGL policy.

In determining if there is a covered accident, the *Sheets* analysis directs our attention to the nature of the damages— do they represent an expected or foreseen event? If the damages suffered relate to the satisfaction of the contractual bargain, it follows that they are not unforeseen. In other words, and in the context of this case, it should not be unexpected and unforeseen that, if the Building delivered does not meet the contract requirements of the sale, the purchaser will be entitled to correction of the defect. This, we believe, would be the expectation and understanding of the reasonably

prudent lay purchaser of a CGL policy. On the other hand, if the defect causes unrelated and unexpected personal injury or property damage to something other than the defective object itself, the resulting damages, subject to the terms of the applicable policy, may be covered. For example, if a collapse of the veneer had injured a user of the facility or damaged property other than the veneer itself, these may well be covered.

This interpretation is consistent with this Court's understanding of CGL policies as expressed in both *Century I* and *Woodfin*. *Century I*, 63 Md.App. at 553–54, 493 A.2d 370 and *Woodfin*, 110 Md.App. at 642, 678 A.2d 116 (citing Roger Henderson, Insurance Protection For Products Liability and Completed Operations—What Every Lawyer Should Know,, 50 NEB. L. REV. 415, 441 (1970))("coverage ... is not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained"). It is also consistent with the federal district court's understanding in *Reliance Insurance Co. v. Mogavero*, 640 F.Supp. 84 (D.Md.1986), "that the insurers issued a general liability policy, not a performance bond" and with the comment by the Court of Appeals in *Sheets* that economic loss for repair and replacement of the faulty facility itself is not covered by a CGL policy. Finally, our interpretation is consistent with the understanding of CGL policies expressed by commentators such as Henderson, as quoted in *Century I*, *Woodfin* and also Robert Franco, *Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies*, 30 TORT & INS. L.J. 785 (1995) ("The CGL policy does not serve as a performance bond, nor does it serve as a warranty of goods and services.")

In his article discussing an insurer's liability under CGL policies, Franco notes that poor performance by an insured is a cost of doing business, not a component of the insurance objective of shifting risk. *Franco*, 30 TORT & INS. L.J. at 786–87. Thus, a contractor's economic loss for poor performance is outside the scope of CGL coverage. *Id.* We

**538**

recognize that the Insureds in the present case did not actually perform construction work on the Building. The same reasoning, however, which would relieve an insurer from indemnifying a contractor in defective workmanship cases applies equally here, where an insured has failed to provide a purchaser with a product that meets the purchaser's expectations.

It is admirable that appellants did the "right thing," as their contract required. By correcting the problem, they may have prevented an actual "occurrence" or "accident" for which there could be coverage. Still, such preventative actions, especially when the action taken is an obligation imposed by contract, are not a sufficient basis for an alternative interpretation of the insurance contract. See *W.M. Schlosser Co., Inc. v. INA*, 325 Md. 301, 600 A.2d 836 (1992).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**