**NABHOLZ CONSTRUCTION CORPORATION d/b/a Conark Builders Plaintiff**

**v.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY Defendant**

No. 4:04–CV–00093–GTE.

United States District Court,
E.D. Arkansas,
Western Division.

Jan. 25, 2005.

David M. Powell, Williams & Anderson, Sarah M. Priebe, Attorney at Law, Little Rock, AR, for Plaintiff.

John E. Moore, Beverly A. Rowlett, Huckabay, Munson, Rowlett & Moore, Little Rock, AR, for Defendant.

### ORDER RULING ON CROSS– MOTIONS FOR SUMMARY JUDGMENT

EISELE, District Judge.

The case is before the Court on Cross–Motions for Summary Judgment. Also before the Court is a Motion to Dismiss filed by Third-party Defendant Mid–Continent Casualty Company ("Mid–Continent"). For the reasons stated below, the Court concludes that judgment as a matter of law must be entered in favor of Defendant St. Paul Fire and Marine Insurance Company. The Court's ruling likely renders moot Mid–Continent's request for dismissal of the Third–Party Complaint.

**1.** The policies in question were actually issued by St. Paul Mercury Insurance Company.

**2.** CONARK contends that the work on the building was completed in April 1997. Two different policies are potentially implicated. The first policy was in effect from April 1,

### FACTS WITHOUT MATERIAL CONTROVERSY

This case arises out of an insurance coverage dispute under a Commercial General Liability ("CGL") policy. Plaintiff Nabholz Construction Corporation d/b/a Conark Builders ("CONARK") seeks reimbursement under a CGL policy issued by Defendant St. Paul Fire and Marine Insurance Company ("ST.PAUL")[1] for $93,450 CONARK paid to repair a faulty roof installed by one of CONARK's subcontractors, Global Services, Inc. ("GLOBAL").

Century Builders, Inc. ("CENTURY"), the general contractor for the construction of a new worship facility for Harvest Time Tabernacle ("HARVEST") of Fort Smith, Arkansas, subcontracted with CONARK to construct the facility's metal building. In turn, CONARK entered into a subcontract with GLOBAL, pursuant to which GLOBAL agreed to provide all labor and equipment for the complete erection of a pre-engineered metal building, including a standing seam roof. GLOBAL completed its work on the project, but sometime thereafter went out of business.

The project was substantially completed by August 1996.[2] On November 25, 1996, HARVEST's pastor wrote a letter to CENTURY complaining of leaks in the roof and advising that the building had leaked from the day it was built. Thereafter, numerous attempts were made to repair the roof. In September of 2002, HARVEST wrote a letter to CENTURY demanding replacement of the roof with a new roof which would not leak. CENTURY advised CONARK of this demand.

1996 through April 1, 1997; the second policy was in effect from April 1, 1997 to April 1, 1998. This dispute does not appear material to the coverage issue because the outcome determinative policy provisions are the same under both policies.

CONARK reported the claim to ST. PAUL. ST. PAUL retained HAAG Engineering to inspect the roof. HAAG Engineering advised that the roof was incorrectly installed. (A copy of the HAAG Engineering report, dated May 13, 2003, is attached as Exhibit E to Def.'s Statement of Undisputed Facts.) On June 9, 2003, ST. PAUL sent a letter to CONARK denying coverage for the defects and deficiencies in the roof, but leaving open the question of possible coverage for damaged ceiling tile and other peripheral damage caused by the leaking roof.

In July 2003, CONARK settled the claims of CENTURY against CONARK in connection with the roof for the sum of $93,450.

On February 3, 2004, CONARK filed the present action in federal court against ST. PAUL seeking reimbursement of the $93,450, with interest, attorney's fees, and costs. ST. PAUL contends there is no coverage under the policy.

On September 14, 2004, ST. PAUL filed a Third–Party Complaint against Mid–Continent Casualty Company ("MID–CONTINENT") contending that in the event coverage is determined to exist for CONARK's claim against ST. PAUL, then MID–CONTINENT, which provided a policy of insurance to GLOBAL, should be required to contribute to or indemnify ST. PAUL for any sums it has to pay. Alternatively, ST. PAUL seeks to reserve its rights of subrogation to enforce the rights of GLOBAL or CONARK against MID–CONTINENT. In response, MID–CONTINENT has filed a Motion to Dismiss contending that the statute of limitations has expired and that ST. PAUL lacks standing to assert the rights of GLOBAL.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986). In deciding a motion for summary judgment, the Court must view all facts and inferences from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The party moving for summary judgment must establish both the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–90, 106 S.Ct. 1348, 89 L.Ed.2d 538.

## DISCUSSION

ST. PAUL issued Policy No. KK09100268 to Nabholz Construction Corp., which policy included Conark as an insured, with a policy period from April 1, 1996 to April 1, 1997 (hereinafter, "the Policy"). A copy of the Policy is attached as Exhibit F to Def.'s Statement of Undisputed Facts. Plaintiff CONARK contends that a different policy, Policy No. KK09100435, was a policy period of April 1, 1997 to April 1, 1998, is the relevant policy.

As the Court has already noted, because the relevant policy language is the same under either policy, the Court need not resolve the conflict over which policy applies.

The Policy provides in pertinent part:

**What This Agreement Covers**

**Bodily injury and property damage liability.** We'll pay amounts any protected person is legally required to pay as damages for covered bodily injury, property damage or premises damages that:

- happens while this agreement is in effect; and
- is caused by an event.

*Property damage* means:

- Physical damage to physical property of others, including all resulting loss of use of that property; or
- loss of use of tangible property of others that isn't physically damaged.

*Event* means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**Exclusions—What This Agreement Won't Cover**

**Injury Or Damage and Medical Expenses Exclusions:**

The exclusions listed below in this section apply to Bodily injury liability, Property damage liability, Personal injury liability, Advertising injury liability or Medical expenses.

\*　　\*　　\*　　\*　　\*　　\*

**Intentional bodily injury or property damage.** We won't cover bodily injury or property damage that's expected or intended by the protected person.

ST. PAUL argues that defects and deficiencies in construction work, such as the defects and deficiencies in the roof of the HARVEST facility due to improper installation, do not constitute "property damage" caused by an "event" and therefore do not trigger liability coverage under the Policy. The engineering report prepared by HAAG indicates that the roof was not properly installed and that the auditorium roof leaked because the roof had not been installed in accordance with manufacturer recommendations.[3] (Report at pp. 6–7,

Exh. E to Def.'s Stat. of Und. Mat. Facts). HAAG found no damage to other parts of the building other than some stained ceiling tiles, and possible damage from water leaking into the perimeter wall cavities and/or behind the Exterior Insulation Finishing System (EIFS). *Id.* CONARK has not disputed the findings of HAAG Engineering.

■ ST. PAUL concedes that the minimal damage of stained ceiling tiles and the possible damage caused by water leaking into perimeter wall cavities or behind the EIFS system would constitute "property damage" within the meaning of the Policy. ST. PAUL disputes, however, that the major claim for removal and replacement of the incorrectly installed roof is covered "property damage."

This particular coverage dispute raises the issue of whether a CGL policy provides liability coverage for deficiencies in construction work. This is a matter of first impression in Arkansas. The Arkansas Supreme Court recognized the split in the jurisdictions concerning whether defective workmanship is an accident and therefore an "occurrence" covered under the terms of a general liability policy in *United States Fid. & Guar. Co. v. Continental Cas. Co.*, 353 Ark. 834, 845 n. 4, 120 S.W.3d 556, 563 n. 4 (2003)(noting split and listing cases). The Court did not resolve the issue, however, instead instructing that the issue of whether the subcontractor's workmanship on the project constituted an "accident" be resolved on remand.[4] *Id.*

---

3. The report details the numerous installation deficiencies. As an example of one such deficiency, the report indicates that the installers of the roof panels had not installed sealant along the interface formed by the panels and the return flange of gutters, and consequently, openings existed between the top back edge of the gutter and the minor ribs. Additionally, inside end closures fitted into the ends of the major ribs had been installed subsequent to original installation. The sealant, installed in

conjunction with the inside closures, did not completely fill the end opening of the major ribs. Numerous fasteners had been driven along the edge of the panels, in some cases for no apparent reason. (HAAG Engineering Report at p. 3, Exh. E to Def.'s Statement of Undisputed Facts).

4. There is no indication of whether, and if so, how, the issue was resolved on remand.

After reviewing the briefs of the parties, the Court is persuaded that ST. PAUL's approach to this issue is the better reasoned one. The Court further predicts that if called upon to resolve this particular issue, the Arkansas Supreme Court would adopt the approach advocated by ST. PAUL and reject the approach favored by CONARK.

The Arkansas Supreme Court opinion in *Unigard Security Ins. Comp. v. Murphy Oil,* 331 Ark. 211, 962 S.W.2d 735 (1998), while not specifically on point, is instructive. In *Unigard,* Murphy Oil sought coverage under a general liability policy for a judgment previously entered against it for breach of a lease contract and for trespass. The underlying facts supporting the judgment were that Murphy Oil had permitted petroleum products and other products to be discharged and/or remain on property it leased from a third party, thereby failing to comply with a lease provision requiring it to surrender the leased premises at the expiration of the lease term "in as good state and condition as reasonable usage thereof [would] permit." *Id.,* 331 Ark. at 216, 962 S.W.2d at 737. The court had to determine whether the damage award against Murphy Oil could be considered " 'sums' " that Murphy Oil became " 'legally obligated' " to pay " 'as damages' " " 'because of,' " or " 'on account of,' " " 'property damage' " that was caused by, or arose out of, an " 'occurrence' " within the meaning of the policies at issue. *Id.,* at 222, 962 S.W.2d at 740, *quoting* policy provisions. The term "occurrence" in the policies at issue in *Unigard* were "essentially defined as an accidental event." *Id.* In denying coverage, the court noted that the damage award resulted not from the property damage resulting from Murphy Oil's operations on the leased property, but rather, from its failure to perform its contractual

obligations. *Id.* Rejecting Murphy Oil's broad contention that coverage was available to an insured under a CGL policy as long as " 'property damage' " was "merely lurking somewhere in the underlying case," Arkansas' highest court instead focused on the underlying cause of the damage, the breach of the lease. *Id.,* at 227, 962 S.W.2d at 743.

Similarly, here, the fact that "property damage" occurred does not alone resolve the issue of whether it was caused by an "event" for which the Policy provides coverage. "Event" [5] is defined in this Policy to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The Arkansas Supreme Court defines "accident" to be "an event that takes place without one's foresight or expectation—an event that proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected." *Continental, supra,* 353 Ark. at 845, 120 S.W.3d at 563. ST. PAUL urges that the definition of "accident" should be read in conjunction with an exclusion to liability coverage which provides: "We won't cover bodily injury or property damage that's expected or intended by the protected person."

The Court agrees that a contractor's obligation to repair or replace its subcontractor's defective workmanship should not be deemed "unexpected" on the part of the contractor, and therefore, fails to constitute an "event" for which coverage exists. The rationale supporting this conclusion was articulated well by the court in *Lerner Corp. v. Assurance Co. of America,* 120 Md.App. 525, 707 A.2d 906 (1998), which explained:

> Damage to the facade of the Building caused by a latent defect should not be

---

**5.** The definition of "event" in the Policy at issue here is essentially the same as the definition of "occurrence" found in other CGL policies.

deemed unexpected or unforeseen. Certainly, the obligation to repair the facade itself is not unexpected or unforeseen under the terms of the sales contract. Therefore, the repair or replacement damages represent economic loss and consequently would not trigger a duty to indemnify under a CGL policy.

\* \* \* \* \* \*

If the damages suffered related to the satisfaction of the contractual bargain, it follows that they are not unforeseen. In other words, and in the context of this case, it should not be unexpected and unforeseen that, if the Building delivered does not meet the contract requirements of the sale, the purchaser will be entitled to correction of the defect.... On the other hand, if the defect caused unrelated and unexpected personal injury or property damage to something other than the defective object itself, the resulting damages, subject to the terms of the applicable policy, may be recovered.

*Id.,* at 536–57, 707 A.2d 906.[6]

This Court predicts that the Arkansas Supreme Court would elect to join "the majority of courts in jurisdictions throughout the country [which] have concluded that defective workmanship does not constitute an 'occurrence' in policies such as the one here." *Heile v. Herrmann,* 136 Ohio App.3d 351, 353–54, 736 N.E.2d 566, 567 (1999)(*citing, e.g., Pursell Constr., Inc. v. Hawkeye–Security Ins. Co.,* 596 N.W.2d 67 (Iowa 1999)); *See also United States Fid. & Guar. Corp. v. Advance Roofing & Supply Co.,* 163 Ariz. 476, 788 P.2d 1227 (Ariz.App.1989)("the better reasoned authorities hold that mere faulty workmanship, standing alone, cannot constitute an

occurrence as defined in [a CGL] policy, nor would the cost of repairing the defect constitute property damages.").

The Court is further persuaded by the distinctions between CGL policies and performance bonds. The purpose of a CGL policy is to protect an insured from bearing financial responsibility for unexpected and accidental damage to people or property. It is not intended to substitute for a contractor's performance bond, the purpose of which is to insure the contractor against claims for the cost of repair or replacement of faulty work. CONARK might have elected to purchase a performance bond to protect it from the known business risk that its subcontractor would not perform its contractual duties. That CONARK has no remedy for its subcontractor's default under its CGL Policy is neither troublesome nor unexpected given the nature of the risks involved. The distinction between the two types of risk for which the market provides two entirely different products has been explained as follows:

When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, occurrence of harm arises which the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely

---

**6.** *See also, Harbor Court Assoc. v. Kiewit Constr. Co.,* 6 F.Supp.2d 449, 457, 459 (D.Md.1998)(damage caused by faulty workmanship was "expected" and therefore not caused by an "occurrence" as defined in CGL policy; defects were "expected" by the contractor, irrespective of whether the actual work was performed by the contractor or one of its subcontractors).

unpredictable [;] the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon warranty theory or, preferably and more accurately, upon tort concepts, injury to persons and damage to other property constitute the risk intended to be covered under the CGL.

*Weedo v. Stone–E–Brick, Inc.;* 81 N.J. 233, 405 A.2d 788, 790 (1979).

The Court concludes that CONARK may not recover the "economic damages" incurred in connection with its subcontractor's construction of a faulty roof, which resulted in a foreseeable breach of contract. This is not a qualifying event which triggers coverage for the resulting "property damage." This would include the cost of removing and replacing the improperly installed roof. CONARK may, however, recover for any resulting property damage which resulted because the roof leaked, such as water stained ceiling tiles.

The Court need not reach CONARK's argument that coverage exists based on the Policy's completed work exclusion, or more accurately, based upon an exception to this exclusion. Because the Court's finding is based upon its conclusion that coverage is lacking under the basic insuring clause, it is unnecessary to consider this exclusion. An exception to an exclusion cannot create or extend coverage where none exists under the terms the policy's basic insuring agreement.

■ As explained by a Tennessee court: If coverage cannot be found in the insuring agreement, it will not be found elsewhere in the policy. Exclusions help define and shape the scope of coverage, but they must be read in terms of the insuring agreement to which they apply. Exclusions can only decrease coverage; they cannot increase it.

*Standard Fire Ins. Co. v. Chester O'Donley & Assoc., Inc.,* 972 S.W.2d 1 (Tenn.Ct. App.1998)(faulty construction case in which court found no occurrence, no property damage, and no coverage).

Nor is it necessary to consider ST. PAUL's alternative argument that CONARK may not recover under the Policy because the five-year statute of repose had expired when CONARK entered into the settlement to resolve HARVEST's claim, thereby rendering the payment gratuitous rather than "legally required," an express condition under the Policy.

Finally, it appears that MID–CONTINENT's Motion to Dismiss is likely moot in light of the Court's other findings. Because, however, there is some coverage under the Policy, albeit limited, for the peripheral water damage to the Harvest structure, the Court will hold MID–CONTINENT's motion in abeyance until the parties have had the opportunity to review this decision, confer, and advise the Court what issues, if any, remain for resolution by the Court.

## CONCLUSION

For the reasons herein stated,

IT IS THEREFORE ORDERED THAT the Motion for Summary Judgment filed by Plaintiff Nabholz Construction Corporation d/b/a Conark Builders (Docket No. 20) be, and it is hereby, DENIED.

IT IS FURTHER ORDERED THAT the Motion for Summary Judgment filed by Defendant St. Paul Fire and Marine Insurance Company (Docket No. 23) be, and it is hereby, GRANTED.

IT IS FURTHER ORDERED THAT the Motion to Dismiss filed by Third–Party Defendant Mid–Continent (Docket No. 32) be, and it is hereby, held in abeyance.

IT IS FINALLY ORDERED THAT the parties confer and advise the Court not

later than February 11, 2005, whether any issues of fact or law remain for this Court to resolve.